George S. ROBINSON, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CM–5.

District of Columbia Court of Appeals.

Argued Jan. 5, 1994.

Decided June 9, 1994.

Gerson Simon, appointed by this court, for appellant.

Chrisellen R. Kolb, Asst. U.S. Atty., for appellee. J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, and John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., were on the brief for appellee.

Before TERRY, KING, and SULLIVAN, Associate Judges.

TERRY, Associate Judge:

Appellant Robinson was convicted of one count of assault [1] for beating up his girl friend, Bobbie Lockett. At trial Robinson

---

1. D.C.Code § 22–504 (1989). Robinson was also charged with threatening to do bodily harm, in violation of D.C.Code § 22–507 (1989), but the court entered a judgment of acquittal on this charge at the close of the government's case.

asserted that he acted in self-defense, claiming that Lockett, who was allegedly drunk and angered by the constant flow of visitors into and out of their shared apartment, twice attacked him with a knife. On appeal Robinson contends that the trial court committed reversible error by refusing to allow him to introduce extrinsic evidence about Lockett's use of alcohol on other occasions in order to impeach her testimony, and by declining to reinstruct the jury on the elements of self-defense after the jury requested additional guidance from the court on the intent element of the crime of assault. We affirm.

## I

### A. *The Government's Evidence*

Robinson and Lockett began sharing an apartment on First Place, N.E., in the spring of 1991. On the evening of August 9, 1991, Lockett waited in the apartment while Robinson and a friend went to the Greyhound bus terminal to pick up Robinson's sister, who was coming in from Philadelphia. At the bus station, however, Robinson was unable to find his sister, and at about 9:30 p.m. he returned to the apartment, apparently enraged by his sister's absence. According to Lockett, who was "half asleep" in the bedroom when he arrived, Robinson began "beating the telephone on the floor" and asked Lockett for the telephone number of the bus terminal. When Lockett did not respond, Robinson struck her in the back with a bottle, causing a large bruise. He then began punching her repeatedly in the face and at one point exclaimed, "Well, I'm going to beat you until my sister gets here." During the course of the attack, which included periods when Robinson was choking Lockett with both hands, the telephone began to ring, and Robinson answered it. The call was from his sister, whose bus had apparently just arrived. Robinson then hung up the phone and went to the bus station to pick her up.

As soon as Robinson had gone, Lockett ran across the street to the apartment of two

friends, Timothy Herbin and Clyde Tyler. From their apartment she called the police to report what had happened. Herbin applied ice to Lockett's eyes and face, which were badly bruised and swollen, and gave her several Motrin tablets to relieve the pain. Herbin and Tyler also noticed that Lockett "could barely talk," apparently because of damage to her larynx. This throat injury, despite medical treatment, turned out to be permanent and left her hoarse.

Officer Anthony Paci testified that he went to the Herbin–Tyler apartment in response to a radio run for an assault. There he found Bobbie Lockett, whose injuries were immediately noticeable. Her right eye was badly swollen, and she had "a real big knot" on the right side of her face. The other eye "was bruised pretty bad," and she had a knot on her back.[2] She was also "scared, crying . . . [and] didn't want to go back to the apartment across the street [because] she was in fear for herself. . . . " Later in the trial, Paci was recalled to the stand and was asked whether he had noticed anything about Lockett that might indicate she had been drinking, such as slurred speech, irregular walking, or an odor of alcohol. Paci's answer was firm: "No, not at all."

Officer Paci broadcast a lookout for Robinson and for the car he was driving. He also advised Lockett of the procedures for obtaining both a civil protection order and a warrant. A few days later, Lockett went to the Citizens Complaint Center and applied for a warrant; it was issued, and Robinson was promptly arrested.

### B. *The Defense Evidence*

Robinson relied on a claim of self-defense, asserting in part that Lockett's alleged drinking on August 9 contributed to her uncontrollable temper. Robinson and two other witnesses, Edward Nelson and Thomas Thompkins, testified that Lockett's behavior on the evening of August 9 suggested that she was intoxicated.

---

**2.** Lockett testified that she received medical treatment for her injuries the next day. She decided not to go to the emergency room that night because she "wasn't bleeding or anything."

Mr. Thompkins, who had come to the apartment at about 6:00 o'clock that evening, recalled that Lockett was in a particularly boisterous mood and that she was making disparaging remarks about Robinson's sister. Thompkins also testified that Lockett was having difficulty walking and that there was an odor of alcohol on her breath. Finally, he noted that Lockett appeared to be refilling a glass from a bottle of whisky that was on the kitchen table. From these observations Thompkins concluded that Lockett was intoxicated on the evening of August 9.

Mr. Nelson, who had come with Thompkins to the apartment that evening, testified that Lockett was "very hyper" and appeared upset about the imminent arrival of Robinson's sister. He also said that Lockett was walking into and out of the kitchen, where he had noticed a bottle of liquor sitting on the table.

Robinson testified that before he left for the bus terminal the first time, he noticed that Lockett had become uncharacteristically talkative and aggressive, which made him believe she had been drinking. When he returned to the apartment without his sister, he noticed that Lockett "was really intoxicated" and that she had apparently consumed half a bottle of whisky during his absence. She began complaining about the amount of time that Thompkins and others spent at the apartment. After Thompkins left, Lockett continued her tirade against Robinson, at one point declaring, "I'm going to make sure that you understand that I mean business when I say I don't want nobody in my house." Furthermore, Robinson testified, Lockett made unkind remarks about his sister, saying among other things that "the bitch might have died before she got here."

Then Lockett went into the bedroom and returned, mumbling something to the effect of "I'm going to show you I mean business." She approached Robinson, reached down to the side of her leg, pulled out a hook-billed knife, and swung it toward Robinson. He dodged the approaching knife, grabbed Lockett's arm, and then struck her in the face. When she tried again to slash him with the knife, Robinson knocked it out of her hand, threw her to the floor, and pinned her down to restrain her movement. In an effort to make her "come to her senses," Robinson placed one hand around her neck as he continued to hold her down.[3] During the struggle, Robinson said, Lockett bumped her head on the floor. Shortly thereafter his sister called from the bus terminal, and he left the apartment to pick her up. Robinson admitted that, despite fearing for his safety, he never told the police about this incident.

The defense also called Alvalonzo Graham, a former co-worker of Lockett, who testified that he suspected Lockett of excessive drinking in the weeks before and after August 9. Although he had never noticed any odor of alcohol on Lockett's breath, Graham thought she was often intoxicated simply by "the way she ... carried herself."

## II

Robinson maintains that the trial court violated his constitutional right to present a defense by refusing to allow him to introduce extrinsic evidence of Lockett's prior drinking habits, dating back to 1985, as a means of impeaching her testimony. We find no error in this ruling. Because the proffered testimony consisted of allegations that Lockett was intoxicated during periods far removed in time from both the date of the assault and the date of trial, we hold that the trial court properly excluded it.

Just before defense counsel began her cross-examination of Bobbie Lockett, the prosecutor asked the court to rule that questions about Lockett's drinking habits "be limited solely to any use that would affect her ability to perceive and recollect events that took place [on the day of the assault] to avoid prejudice of any outside drinking or drug use." Although the court did not entirely

---

**3.** Robinson admitted on cross-examination that he did not smell any alcohol on Lockett's breath, even when he was trying to restrain her on the floor.

agree with the government's rationale, it granted the motion and restricted defense counsel's questions about drinking "to that date...."

During her cross-examination of Ms. Lockett, defense counsel raised the issue of her involvement with alcohol in the following manner:

Q. ... [C]ould you describe yourself as a person who has a few drinks?

A. I used to until I came over with cirrhosis of the liver.

Q. Pardon me, I'm sorry?

A. I said I used to drink until I came up with cirrhosis of the liver. It was diagnosed in '85.

\* \* \* \* \* ' \*

Q. Okay. In 1991, August of 1991, you were still drinking, isn't that true?

A. No.

Q. There was some liquor in the house, in the apartment, isn't that true?

A. Very true.

The government made no objection to this line of questioning. Later, during the direct examination of Mr. Graham, defense counsel attempted to impeach Lockett's previous testimony by asking, "Could you tell the court and the jury whether Ms. Lockett drinks alcohol?" After the government objected, the following discussion took place at the bench:

THE COURT: What's the basis of the objection?

MR. TALBERT [the prosecutor]: I would object to evidence of alcohol use outside of August 9, 1991, the day of the incident, as overly prejudicial to the complainant and not relevant to the purposes for which such testimony should be offered.

MS. RODE [defense counsel]: It is to impeach her credibility. She testified that the last time she drank was in 1985, and she's denied use on that particular day of August 9th.

THE COURT: So unless she says she drank on that day, I am not going to allow anything else.

MS. RODE: Your Honor—but she testified that the last time she drank was in 1985.

THE COURT: So?

MS. RODE: And this is to impeach her credibility because she's obviously lying.

THE COURT: No, the day [in] question is only the day in question. You can't prove this as a collateral issue. It's collateral. It goes to the day that it happened. Your defense is that she had been drinking, she was drunk and she started it.

MS. RODE: Right, and maybe I am not making myself clear, but she testified that the last time she had a drink was in 1985, and she has denied that since 1985 she has ... had any drinks. I am only bringing this witness in to impeach her on her statement that she's never touched alcohol since 1985.

THE COURT: I am only going to allow it as to one day. If she said she had a drink on Christmas Eve in '86, so what?

MS. RODE: Well, that would show that she was lying.

THE COURT: It would show—it may show that [in her testimony on] cross-examination she was wrong, but that's all it shows. It may show that she wasn't telling the truth about a question that should have been objected to, but was not. We are not going to try this case on drinking habits.

Robinson now challenges this ruling on the ground that it interfered with his constitutional right to present a defense. *See Bassil v. United States,* 517 A.2d 714, 716 (D.C. 1986).

The applicable legal principles are not in dispute. "It is well settled that a party may not present extrinsic evidence to impeach a witness on collateral issues." *Washington v. United States,* 499 A.2d 95, 101 (D.C.1985) (citations omitted). In practical terms, this rule requires trial courts to exclude evidence

if it "would not have been admissible independently for any purposes other than ... contradiction." *McClain v. United States,* 460 A.2d 562, 569 (D.C.1983); *accord, Patterson v. United States,* 580 A.2d 1319, 1322 (D.C.1990). With specific reference to the situation presented here, "impeachment of a witness' character for truthfulness by means of specific instances of conduct not resulting in a conviction is collateral." JOHN W. STRONG, *et al.,* MCCORMICK ON EVIDENCE § 49, at 183 (4th ed. 1992).

Against this legal backdrop, and in light of defense counsel's stated purpose for offering Graham's testimony, we have little difficulty in affirming the trial court's ruling. Whether Lockett had consumed alcohol between 1985, when she said she had stopped drinking, and August 9, 1991, was plainly irrelevant to the only alcohol-related issue before the jury: whether she was intoxicated and abusive on August 9, as claimed by Robinson and other defense witnesses. At the bench conference defense counsel conceded that the sole purpose of asking Mr. Graham whether Ms. Lockett "drinks alcohol" was to impeach Lockett's testimony that she had not taken a drink since 1985. Under established precedent, such testimony from Mr. Graham would have been collateral and hence inadmissible.

The narrow exceptions to the rule against impeachment by collateral evidence recognized in *Jones v. United States,* 548 A.2d 35, 39 (D.C.1988), and *Patterson v. United States, supra,* 580 A.2d at 1322, do not apply in this case. In both *Jones* and *Patterson,* this court affirmed the trial court's decision to admit otherwise collateral testimony when that testimony tended to show the defen-

dants' familiarity with narcotics. Crucial to both decisions was the fact that in each case the defendant asserted a claim of innocent possession [4] or innocent presence,[5] which the government sought to contradict by extrinsic evidence during rebuttal. *Jones, supra,* 548 A.2d at 39; *Patterson, supra,* 580 A.2d at 1323. The same situation is not present here; Lockett's drinking history prior to August 1991 was—and remained—completely irrelevant throughout the trial.

■ In any event, Robinson's assertion that he suffered prejudice as a result of the court's ruling is meritless. The entire defense theory was that Lockett was drunk on the night of August 9. Robinson, Thompkins, and Nelson testified extensively that Lockett was indeed inebriated as early as 6:30 p.m. and that her level of intoxication increased over the course of the evening. Thus the defense was able to present considerable evidence showing not only that Lockett had been drinking that night but also that she had lied on cross-examination. Moreover, the trial court was considerably more generous than the law required in permitting testimony about Lockett's intemperance, not only on the day of the altercation but during the entire month surrounding the incident. In the end, the jury simply rejected Robinson's defense and the testimony suggesting that Lockett was drunk on the evening of August 9.

■ Robinson also claims that evidence about Lockett's general use of alcohol should have been admitted because it was probative of her diminished sensory capacity. We disagree. Under accepted evidentiary principles, proof of a witness' general intemper-

---

4. The defendant in *Jones* said that he had witnessed the arrest of three other persons earlier in the day, and that he had picked up some items that one of them threw away, thinking they might have some value. When he saw that the discarded items were small packets of white powder, he "put them in his sock, intending to find out what the white powder was and, if it turned out to be cocaine, to try it out of curiosity." 548 A.2d at 37. When he was arrested a few minutes later, the police seized the packets of white powder (which was cocaine) from inside

his sock. He testified at trial that he had never before used cocaine, nor did he on that day.

5. In *Patterson* the defendant was arrested when the police executed a search warrant in an apartment which she shared with others. At trial she "claimed innocent presence and an unfamiliarity with drugs, attempting at the same time to implicate [the other occupants of the apartment]." 580 A.2d at 1319.

ance "tells us nothing of the witness' testimonial capacity except as it indicates actual intoxication at the time of the event observed or the time of testifying; and hence, since in its bearing upon moral character it does not involve the veracity trait, it will usually not be admissible." 3A J.H. WIGMORE, EVIDENCE § 933 (Chadbourn rev. 1970) (citation and footnote omitted); *see United States v. DiPaolo*, 804 F.2d 225, 230 (2d Cir.1986); *Springer v. Reimers*, 4 Cal.App.3d 325, 340, 84 Cal.Rptr. 486, 494–495 (1970); *State v. Burke*, 522 A.2d 725, 732–733 (R.I.1987). Because the defense was given free rein to demonstrate that Lockett was intoxicated on the night of the assault, and because there was never any suggestion that she was intoxicated at trial, we hold that the trial court correctly prevented Mr. Graham from testifying about Lockett's supposed intemperance on other occasions.

For these reasons, we hold that the trial court fully respected Robinson's constitutional right to present a defense, and that it acted properly in excluding any additional testimony about Lockett's drinking history.

### III

Robinson also contends that the trial judge abused her discretion in failing to reinstruct the jury on the elements of self-defense when she was asked simply to reiterate the applicable law on the element of intent. We find no abuse of discretion.

■ Shortly after beginning its deliberations, the jury sent a note to the trial judge containing several requests. Among them was a question asking, "What is assault and intent law? (Read to jurors for better understanding.)" In response, the judge explained the difference between general and specific intent, pointed out that assault was a general intent offense, and provided examples of each type of intent.

Before giving this additional instruction, the judge met with both counsel to let them

know what she was going to do. During this conference, defense counsel requested that the judge also reinstruct as to self-defense as well, citing this court's decision in *Davis v. United States*, 510 A.2d 1051 (D.C.1986). In rejecting counsel's request, the judge reasoned, "[T]his is a specific question. It seems to me that if they don't understand self-defense, they will send back a note and they will ask for self-defense, too. So I am just going to answer what they ask." Robinson now argues that this ruling was error because it unduly emphasized the government's case.[6]

"Decisions regarding reinstruction of a jury are committed to the discretion of the trial court; absent abuse of that discretion we will not reverse." *Davis, supra*, 510 A.2d at 1052; *accord, e.g., Bedney v. United States*, 471 A.2d 1022, 1024 (D.C.1984). In *Davis* this court specifically found no abuse of discretion when the trial court declined to reinstruct the jury on self-defense after the jury had requested further guidance as to the elements of voluntary manslaughter. 510 A.2d at 1053. Moreover, in *Potter v. United States*, 534 A.2d 943, 946 (D.C.1987), this court held:

> The court's failure when instructing the jury to repeat the self-defense instruction after giving the instruction for possession of a prohibited weapon, or at least to specify that self-defense was available to the charge, was not by itself plain error.

Robinson's claim of error is foreclosed by these decisions, particularly by *Davis*.

It is true, of course, that in *Davis* we cautioned trial judges that the better practice was to give more evenly balanced reinstructions, even when the jury asks only about the elements of the principal offense. At the very least, we urged judges to tell juries that any partial reinstruction represented only a portion of the original charge. 510 A.2d at 1053. Nevertheless, *Davis* also recognized that, in most cases, failure to follow these

---

6. Robinson does not challenge the original instructions, which included a thorough explanation of the law of self-defense.

guidelines will not amount to an abuse of discretion.

There is nothing unusual about this case to suggest that the trial judge abused her discretion in refusing defense counsel's request to reinstruct on self-defense as well as intent. The record shows that the jury received the original instructions, including the relevant language on self-defense, late on a Thursday afternoon and retired to deliberate at about 4:30 p.m. Barely twenty minutes later, the judge received the note which contained the jury's request for additional instructions. The judge did not respond immediately, but on Friday morning, as the first order of business, she gave the reinstruction that the jury had asked for, and invited the jury to send out additional notes if any confusion remained. Given this sequence of events, with the reinstruction coming so soon after the original charge, we think it most unlikely that the jury would have forgotten what the judge had said about self-defense. Moreover, by answering only the question that was asked and stating a willingness to respond to additional questions, the judge refrained from emphasizing the government's case in a prejudicial manner. We thus conclude that Robinson's claim of error is without merit.

The judgment of conviction is

*Affirmed.*