Gale S. MOLOVINSKY, t/a Executive Suite, Appellant,

v.

FAIR EMPLOYMENT COUNCIL OF GREATER WASHINGTON, INC., et al., Appellees.

No. 93–CV–1142.

District of Columbia Court of Appeals.

Argued June 6, 1995.
Decided Oct. 3, 1996.

Gale S. Molovinsky, pro se.

Joseph M. Sellers, Washington, DC, with whom Avis E. Buchanan, John R. Erickson, and Paul D. Manca were on the brief, for appellees.

Before FERREN, TERRY, and STEADMAN, Associate Judges.

PER CURIAM:

Appellees Maria Henderson, Laura Hodges, Karen Baker, and the Fair Employment Council of Greater Washington, Inc. ("FEC"), filed this sex discrimination suit against appellant Molovinsky. In their complaint, the three female plaintiffs alleged that when, in response to an advertisement, they sought employment advice from appellant, he sexually harassed them, in violation of the District of Columbia Human Rights Act, D.C.Code §§ 1–2501 to 1–2557 (1992) ("DCHRA" or "the Act"). The FEC alleged that appellant's conduct violated the DCHRA and frustrated the FEC's purpose by forcing it to divert resources from its established programs in an effort to address appellant's misconduct. A jury found appellant liable and awarded damages to all of the appellees. Before this court appellant makes several assignments of error. He contends (1) that the FEC and the individual testers (Hodges and Baker) lacked standing to bring an action against him and were therefore not entitled to damages; (2) that the evidence was insufficient to permit the jury to find that his company, "Executive Suite," met the statutory definition of an "employment agency"; (3) that the evidence was insufficient to permit the jury to find that his conduct was a "discriminatory practice" within the meaning of the DCHRA; (4) that the evidence was insufficient to justify an award of punitive dam-ages; (5) that the trial court erred in allowing him to be impeached with evidence of a prior conviction; (6) that the court erred in permitting appellees' counsel to strike a white male juror; and (7) that the court erred in refusing to reread its entire instruction on punitive damages in response to a jury note. We decline to reach the second, third, and fourth arguments because appellant failed to preserve those issues for appellate review. We reject his other arguments and affirm the judgment.

I

In the spring of 1990, Maria Henderson responded to an advertisement by appellant's company, Executive Suite, in the Washington Post which offered career opportunities paying from $25,000 to $100,000. Ms. Henderson called and made an appointment for an interview with appellant Molovinsky, the owner, at the Executive Suite offices in downtown Washington. On the scheduled date, while Ms. Henderson was waiting to meet with Mr. Molovinsky, the receptionist gave her a brochure explaining the various services offered by Executive Suite. The brochure promoted enhancement of personal skills, strategic and educational advice and consultation, and referral services.

During the interview Mr. Molovinsky discussed with Ms. Henderson various ways to improve her résumé. He also said that by using his services she could bypass personnel departments and make contact directly with the chief executive officers of major companies. However, when he told her that he charged between $300 and $1500 for his services, Ms. Henderson explained that she could not afford them. At that point, according to Henderson's testimony, Molovinsky's demeanor changed: he became "very rude and vulgar" and made references to "sugar daddies," "pimps," and "prostitution." Molovinsky told Henderson that if she would just "give a little bit part of [her] life," he would give her "the greatest deal of [her] life." When Ms. Henderson asked him what he meant, Molovinsky lowered his voice and said, "Sex." He told her that "through sex, that's a way of taking care of the financial problem."

Ms. Henderson reported Molovinsky's conduct to the Washington Lawyers' Committee for Civil Rights ("WLC"), which forwarded her complaint to the FEC. After determining that the matter warranted further investigation, the FEC designed a gender discrimination testing program and arranged for four testers—two men and two women—to pose as job seekers and visit Executive Suite. Each tester telephoned Executive Suite individually and arranged for an appointment with Mr. Molovinsky.

The two female testers, Laura Hodges and Karen Baker, had experiences similar to that of Ms. Henderson. When they informed Molovinsky that they could not afford his services, he offered to provide free services in exchange for his being their "sugar daddy" or "pimp." All three women, including Ms. Henderson, testified at trial that Molovinsky's eye contact and sexually suggestive hand gestures had made them uncomfortable, that they had felt humiliated, and that they had lasting negative impressions of their encounter with him.

Agatha Farngalo, a woman who independently had made a similar complaint to the WLC, testified that when she visited Molovinsky in 1990 prior to Ms. Henderson's visit, Molovinsky had asked her also if she had a "sugar daddy" and offered to waive his fees in exchange for sex, even suggesting at one point that they go to a room in a nearby hotel. Ms. Farngalo also testified to the lingering emotional effects and humiliation she had experienced.

The testimony of the two male testers, John Pospisil and Ernest Tuckett, was quite different. They said that when they informed Mr. Molovinsky that they could not afford his services, Molovinsky merely told them to get a job, earn some money, and come back later. Pospisil and Tuckett also testified that Molovinsky had represented Executive Suite as "the only employment agency in town for college graduates."

Inez Smith Reid, the Chairperson of the FEC, testified about the harm that Molovinsky's conduct caused to the FEC. Ms. Reid explained that the FEC's purpose is to promote equal employment opportunity within the District of Columbia, and that its primary goals are to train high school students, to conduct research to identify barriers to equal employment opportunities, to engage in race testing to uncover racial discrimination, and to participate in community outreach and public education. According to Ms. Reid's testimony, Molovinsky's conduct had frustrated the FEC's purpose by forcing it to divert resources from its established programs to undertake sexual discrimination testing. The FEC thus had to incur unexpected costs for counseling victims of sex discrimination, for educating the public about the kinds of unacceptable conduct that constituted sexual harassment, and for placing additional emphasis on community out-reach and public education.[1]

Molovinsky's defense consisted solely of his own testimony. He denied propositioning the female testers and Ms. Henderson and denied suggesting to any of them that he would waive his fees in exchange for sex. He admitted that he might have used the term "sugar daddy," but he insisted that if he did, it was merely part of a standard sales pitch that included asking people who lacked funds whether they had "a favorite uncle or somebody" to take care of them.

The jury returned a verdict against Molovinsky and awarded damages to each of the plaintiffs. To Ms. Henderson the jury gave $17,000 in compensatory damages and $10,000 in punitive damages; to Ms. Baker and Ms. Hodges, $5,000 each in compensatory damages and $10,000 each in punitive damages; and to the FEC, $22,000 in compensatory damages.

## II

Mr. Molovinsky urges us to reverse on the ground that the individual testers and the FEC lacked standing to bring an action against him. We hold that both the individual testers and the FEC had standing to bring claims under the DCHRA.

---

1. The parties stipulated that Executive Suite's yearly advertising budget was $12,000. Ms. Reid testified that the FEC used Executive Suite's advertising budget as a proxy for the publication costs necessary to counteract the publication effects of Molovinsky's discriminatory practices.

### A. *Individual Tester Standing*

■ Molovinsky relies on *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 307 U.S.App. D.C. 401, 28 F.3d 1268 (1994), for the proposition that individual testers do not have standing to sue under the DCHRA. *BMC*, however, has little persuasive value on the tester standing issue. The *BMC* court did not address the anti-discrimination provision that most closely resembles the DCHRA in terms of prohibited practices and available relief: Title VII of the 1964 Civil Rights Act, as amended by the 1991 Civil Rights Act.[2] *See* 42 U.S.C. §§ 2000e–1 to 2000e–17 (1994); *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 & n. 17 (D.C.1993). Thus we turn to the language of the DCHRA itself in deciding the tester standing issue.

■ The DCHRA allows "[a]ny person claiming to be aggrieved" by a discriminatory practice to bring an action in court against the offending party. D.C.Code § 1–2556(a). The Supreme Court has construed the nearly identical language of the Civil Rights Act of 1968 ("any person who claims to have been injured") to confer standing to the full extent that Article III of the Constitution permits. *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972); *see Gray v. Greyhound Lines East*, 178 U.S.App. D.C. 91, 98, 545 F.2d 169, 176 (1976) (construing Title VII language, identical to the DCHRA, to confer standing to the limits of Article III). Although this court is not bound by Article III,

the use of the quoted phrase indicates to us that standing under the DCHRA is co-extensive with standing under Article III.

■ Violation of a plaintiff's statutory rights may itself constitute an "actual or threatened injury" sufficient to confer Article III standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982). In *Havens* the Supreme Court held that a tester who alleged a violation of her statutory right to truthful housing information satisfied the Article III requirement of injury in fact. *Id.* at 374, 102 S.Ct. at 1121. The plaintiff testers in this case alleged a violation of their statutory right to be free from sexual harassment.[3] As in *Havens*, the injury to their rights was direct and personal. Furthermore, the statutory violation and accompanying injury exist without respect to the testers' intentions in initiating the encounters. "That the tester may have approached [appellant] fully expecting to [experience sex discrimination], and without any intention of [accepting an employment referral], does not negate the simple fact of injury within the meaning of [the DCHRA]." *Id.; see also Evers v. Dwyer*, 358 U.S. 202, 204, 79 S.Ct. 178, 180, 3 L.Ed.2d 222 (1958) (fact that plaintiff boarded racially segregated bus for the sole purpose of instituting litigation to challenge segregation was "not significant"). Thus we hold that the testers in this case had standing to sue for the alleged violation of their rights under the DCHRA.[4]

> The 1991 Civil Rights Act amended Title VII to provide for damages as a remedy for past violations, as does the DCHRA. At the time of the events in *BMC*, however, Title VII did not authorize an award of damages, and the testers in that case failed to satisfy constitutional (Article III) requirements for standing to sue to enjoin future violations because they did not show a likelihood that they would be the subject of future violations. *BMC, supra*, 307 U.S.App. D.C. at 405, 28 F.3d at 1272.

**2.** For example, 42 U.S.C. § 2000e–2 (b), part of the Civil Rights Act, states:

> It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin....

D.C.Code § 1–2512(a), part of the DCHRA, states:

> It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, color, religion, national origin, [or] sex ... of any individual:
>
> \* \* \* \* \* \*
>
> (2) To fail or refuse to refer for employment, or to classify or refer for employment, any individual, or otherwise to discriminate against, any individual....

**3.** As we shall explain in part III of this opinion, Mr. Molovinsky has waived any challenge to the applicability of the DCHRA to the facts alleged.

**4.** The plaintiff testers in this case were acting under the auspices of an established program for combatting employment discrimination, the directors of which had reason to believe that Mr.

## B. *Organizational Standing*

■ Molovinsky also argues that the FEC lacks standing to recover compensatory damages because it cannot show "injury in fact."[5] Relying again on *BMC*, he asserts that the FEC's diversion of funds to test for gender-based discrimination was "self-inflicted" and thus not an injury at all. *See BMC*, 307 U.S.App. D.C. at 409–410, 28 F.3d at 1276–1277. Courts are divided as to whether the diversion of resources constitutes an "injury in fact" which confers standing on a plaintiff. *Compare BMC, supra, with Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir.1990). We need not decide whether it does or does not, however, because a different theory supports FEC's standing to sue in this case.

The Supreme Court held in *Havens, supra*, that a fair housing organization would have standing to sue if the defendant's discriminatory practices "perceptibly impaired" the organization's ability to achieve its purpose of improving equal housing opportunity through counseling and referral services. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources"—conferred standing, the Court said. *Havens*, 455 U.S. at 379, 102 S.Ct. at 1124; *accord, BMC, supra*, 307 U.S.App. D.C. at 410, 28 F.3d at 1277; *Spann v. Colonial Village, Inc.* 283 U.S.App. D.C. 216, 221, 899 F.2d 24, 29, *cert. denied*, 498 U.S. 980, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990). Mr. Molovinsky concedes that, analogously, the FEC has standing to sue for frustration of its purpose.[6] Record evidence supports a finding that Molovinsky's discriminatory conduct frustrated the FEC's purpose of promoting equal employment opportunity. Ms. Reid testified that the FEC had to increase its counseling of sex discrimination victims and its educational efforts in order to counteract the negative message, sent to the public by Molovinsky's conduct, that sex discrimination is acceptable behavior. Thus the FEC established its standing to sue for compensatory damages for frustration of its purpose.[7]

## III

■ Molovinsky raises three claims of evidentiary insufficiency. First, he argues that the evidence was insufficient to establish that Executive Suite met the statutory definition of an "employment agency." Second, he argues that the evidence could not support a finding that his alleged actions were a "discriminatory practice" within the meaning of the DCHRA. Third, he contends that the evidence was insufficient to justify an award of punitive damages. None of these claims was properly preserved for appeal, however. Molovinsky moved for a directed verdict at the close of the plaintiffs' case on the "employment agency" and "discriminatory practice" grounds, but he did not renew that motion or move for a directed verdict[8] at the close of all the evidence. This court strictly construes Super. Ct. Civ. R. 50, which governs such motions. The failure to make a Rule 50 motion "precludes a party from questioning on appeal the sufficiency of the evidence." *Howard University v. Best*, 547

---

Molovinsky might have been committing a discriminatory practice. We express no opinion as to the availability of a cause of action under the DCHRA to testers not similarly situated.

5. The FEC does not claim standing as a representative of the real parties in interest, but as a plaintiff in its own right.

6. Molovinsky states in his brief that "to the extent FEC was perceptibly impaired in its programs ... and its programs are rendered less effective, it is entitled to damages."

7. Although the record does not reflect the basis for the jury's award of damages to the FEC, Molovinsky's failure to request a special verdict enables us to affirm the award on the frustration of purpose theory. *See Nimetz v. Cappadona*, 596

A.2d 603, 608 (D.C.1991) (defendant who fails to request a special verdict is estopped from complaining on appeal that the verdict is defective when at least one theory of liability is valid). In any event, the amount of compensatory damages that the FEC sought for frustration of its purpose exceeded the amount of compensatory damages awarded, and thus the entire award to the FEC may be attributed to damages resulting from frustration of its purpose.

8. A motion for directed verdict was the appropriate motion to make at the time this case was tried in 1993. Under a 1995 amendment to Rule 50, it is now called a motion "for judgment as a matter of law."

A.2d 144, 147 (D.C.1988) (citations omitted). Although "technical precision" is not required in moving for a directed verdict, *King v. Kidd,* 640 A.2d 656, 666 (D.C.1993) (citing *Best*), the failure to make a motion at all is more than just a technical defect. Therefore, we conclude that Mr. Molovinsky waived his right to challenge on appeal the sufficiency of the evidence that Executive Suite was an "employment agency" engaged in a "discriminatory practice." *A fortiori,* he also waived his right to challenge the sufficiency of the evidence supporting the award of punitive damages, which he never raised at all before the trial court.[9]

## IV

◼ Molovinsky asserts that the trial court erroneously allowed him to be impeached, on cross-examination, with his prior conviction of conspiracy to counterfeit or alter currency of the United States. He argues that the prejudicial effect of that evidence outweighed its probative value and was used solely to inflame the jury. This argument ignores D.C.Code § 14–305(b) (1995), which provides that "evidence that the witness has been convicted of [certain] criminal offense[s] *shall be admitted* if offered on cross-examination" (emphasis added), so long as the witness' release from confinement or the expiration of parole, probation, or sentence, whichever was later, occurred no more than ten years before the trial date. D.C.Code § 14–305(b)(2)(B).[10] The admission of such evidence is not discretionary. *See, e.g., Langley v. United States,* 515 A.2d 729, 735 (D.C.1986) ("a trial court has no discretion to preclude use of prior convictions for impeachment"); *Dorman v. United States,* 491 A.2d 455, 458 (D.C.1984) (en

banc) ("Congress has prescribed that certain convictions are relevant to a fact finder's credibility determination. We are bound by Congress' policy decision."). Section 14–305 in its present form was enacted in 1970 as part of the District of Columbia Court Reorganization Act, Pub.L. No. 91–358, 84 Stat. 473, 551 (1970). The legislative history of that statute demonstrates that it was expressly designed to "eliminat[e] the discretion of the trial judge to limit or prevent impeachment of a witness by proof of a conviction of [a] criminal offense...." H.R..REP. No. 91–907, 91st Cong., 2d Sess. 62 (1970).[11] Thus Molovinsky's claim of error must fail in light of section 14–305(b).

◼ Molovinsky also contends that the final jury composition of six black women, one white woman, and one black man constituted "clear racial and sex discrimination" and denied him a fair trial. Although his argument is not entirely clear, Molovinsky appears to be challenging the use by appellees' counsel of one peremptory challenge to strike a prospective white male juror. Upon Molovinsky's objection to the juror's removal, the court said:

> Okay. I don't think there is any substance at all to your allegations either with respect to the panel, the way in which the panel was selected, and certainly nothing with respect to the discriminatory use of peremptory challenges.
>
> There was one white male that was struck who was a lawyer, and simply there was one strike utilized. There's not even a prima facie case such that I would even require further of Ms. Buchanan whether or not her intent was discriminatory based upon gender bias.... I'm not going to have further inquiry on this record.

---

**9.** Appellant's *pro se* status does not change this result. Whatever the situation might be with other *pro se* litigants, a matter that we need not address here, Mr. Molovinsky is a law school graduate and a former member of the bar. We see no reason to excuse his failure to comply with the rule.

**10.** The ten-year limit was met here. Molovinsky's sentence ended in 1985, and the trial took place in 1993, only eight years later.

The statute requires, in addition, that the conviction be either for a felony or for an offense

involving dishonesty or false statement, D.C.Code § 14–305(b)(1), a requirement that was also satisfied here.

**11.** Such discretion had been recognized a few years earlier in *Luck v. United States,* 121 U.S.App. D.C. 151, 348 F.2d 763 (1965), which had construed an earlier version of section 14–305. The legislative history makes clear that Congress specifically intended to overrule *Luck,* rejecting the *Luck* rule as "absolutely unworkable." H.R.REP. No. 91–907, *supra,* at 63.

With respect to the composition of the panel itself, there are a lot of women on the panel. I don't think that naked allegation itself even raises the claim, the protection claim, any other claim that requires the court to take any action at all.

The Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), fashioned a three-part test to evaluate claims by a party that another party has exercised his or her right of peremptory challenge in a discriminatory manner. First, the party claiming a *Batson* violation must make a *prima facie* showing of purposeful discrimination. Once that has been done, the burden shifts to the other party to establish a nondiscriminatory reason for the strike. If such a reason is shown, the burden shifts back to the party claiming a violation, who must then show that the strike was motivated by intentional discrimination. *Id.* at 96–98, 106 S.Ct. at 1722–24.

 On the record before us, we are satisfied that the trial court, after a proper *Batson* inquiry, did not err in concluding that Molovinsky had failed to show *prima facie* that counsel's single peremptory strike was based on a discriminatory reason. Appellees struck only one juror, a white male lawyer, and Molovinsky failed to "come forward with *facts*, not just numbers alone," to make a *prima facie* showing of discrimination. *Little v. United States*, 613 A.2d 880, 886 (D.C. 1992) (citations omitted). "This court ... must give deference to both the trial court's findings of fact and its ultimate ruling on whether the defendant satisfied the prima. facie burden." *Id.* at 885 (citing *Batson, supra*, 476 U.S. at 97, 106 S.Ct. at 1723). We find no error here.[12]

 Finally, Molovinsky contends that the trial court erred when it failed to reread its entire instruction on punitive damages

after the jury sent a note asking, "Does the jury need to find future harm in order to award punitive damages?" In response to this question, the court said:

> I think I understand the point you're getting at, and the short answer to the question is no. You must determine whether to award punitive damages based upon the defendant's actual conduct in this case.

Molovinsky argues that the court's "short answer" was inadequate and prejudicial because it did not remind the jury of the high degree of malice necessary to award punitive damages. He does not argue, however, that the trial court's statement was *inaccurate.*[13] The trial court had discretion to respond to the jury's note in the degree of detail the court believed was warranted. *Robinson v. United States*, 642 A.2d 1306, 1311 (D.C. 1994). The note revealed no confusion about the mental state that would justify an award of punitive damages. Even if a detailed explanation might have been more favorable to Mr. Molovinsky, we find no abuse of discretion in the decision to give a "short answer" to a specific question.

### V

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

TERRY, Associate Judge, concurring:

I join fully in the court's opinion. I write separately, however, to note a possible defect in the DCHRA which our legislature, the Council of the District of Columbia, might appropriately address.

Mr. Molovinsky contends that the evidence was insufficient to prove that his conduct was a "discriminatory practice" proscribed by the

---

12. Molovinsky makes two other allegations about the jury. First he asserts that the one male juror was elderly and slept throughout the trial. This claim is contradicted by the court's own statement on the record: "He's an elderly gentleman, and I did see him close his eyes, so he does do that occasionally, but I watched him [to] see if he ever went to sleep. He never went to sleep." We have no reason to conclude that this statement was incorrect. Second, Molovinsky makes claims about juror comments off the record after

trial. These alleged comments are totally undocumented, however, and Molovinsky has not shown any "extraneous influence" that would warrant reversal of the judgment. *See Tanner v. United States*, 483 U.S. 107, 117, 107 S.Ct. 2739, 2745, 97 L.Ed.2d 90 (1987).

13. Accordingly, we express no opinion as to the accuracy of the trial court's explanation.

DCHRA. The Act provides that it is an "unlawful discriminatory practice to ... fail or refuse to refer for employment ... any individual, *or otherwise* to discriminate against, any individual." D.C.Code § 1–2512(a)(2) (emphasis added). Molovinsky argues that he did not "fail or refuse" to refer the women testers for employment, nor did he offer better services to the men. Indeed, after learning of their inability to pay, he refused his services equally to the men. He further argues that the conduct alleged by appellees, even if proven, is not actionable because it is not the type of discrimination prohibited by the statute. Appellees contend, on the other hand, that the phrase "or otherwise" gives the statute broad application to cover all employment relationships, including the type of sexual harassment in which Molovinsky engaged.

There is no question that Molovinsky's behavior was crude, boorish, and utterly unacceptable. He makes a compelling argument, however, that this type of conduct is not prohibited by the DCHRA. Although sexual harassment is actionable as a discriminatory practice under Title VII, it has been limited to situations in the workplace that either involve the conditioning of concrete employment benefits on sexual favors or create a hostile working environment. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Since no employment relationship existed between Molovinsky and the testers, neither of these conditions is met here. I have found no case, nor have appellees cited any, suggesting that the phrase "or otherwise" should be construed so as to bring conduct such as that of Mr. Molovinsky within the ambit of the DCHRA. On the other hand, I would be reluctant to interpret narrowly a statute that was "undoubtedly intended" by the legislature "to be read broadly to eliminate the many proscribed forms of discrimination in the District...." *Dean v. District of Columbia,* 653 A.2d 307, 320 (D.C.1995).

I agree with my colleagues that we need not decide whether the evidence was sufficient to establish a discriminatory practice because Mr. Molovinsky failed to preserve the issue for appellate review by moving for a directed verdict on this ground. Nevertheless, the issue is a troubling one, and the statutory language is not as clear as it ought to be. Mr. Molovinsky has exposed what may be a significant loophole in the statute. If the Council believes that conduct such as that of Mr. Molovinsky is or should be actionable under the DCHRA, it may wish to consider legislative action to make clear that the DCHRA covers such behavior.