Nathaniel THOMAS, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CF–344.

District of Columbia Court of Appeals.

Argued Dec. 12, 2002.

Decide May 22, 2003.

John Tan, Public Defender Service, with whom James Klein, Samia Fam, and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Assistant United States Attorney, were on the brief, for appellee.

Before SCHWELB, FARRELL, and RUIZ, Associate Judges.

PER CURIAM:

The judgment is affirmed for the reasons stated in Judge Schwelb's lead concurring opinion, except with respect to the issue discussed in Judge Farrell's concurring opinion and in Part I of Judge Ruiz' dissenting opinion. As to that issue, the judgment is affirmed for the reasons stated in Judge Farrell's opinion and in footnote 13 to Judge Schwelb's opinion.

*Affirmed.*

SCHWELB, Associate Judge, concurring:

Nathaniel Thomas was convicted by a jury of simple assault.[1] He was found not guilty of the more serious charges of aggravated assault,[2] attempted malicious disfigurement,[3] and assault with a dangerous weapon,[4] namely, a hot liquid. On appeal, Thomas presents several contentions, none of which warrants reversal of his conviction; any possible trial court errors, considered individually or cumulatively, were harmless. Accordingly, I concur in the affirmance of the judgment.

I.

THE EVIDENCE

This case arose out of a quarrel between the defendant and Clarice Johnson, the mother of his four-year-old son, Tevin. According to Ms. Johnson, Thomas came to her home on May 25, 1999, ostensibly to give her some money in connection with Tevin's preschool graduation. Later in the evening, Thomas began to interrogate Ms. Johnson regarding whether she had been seeing another man. Thomas appeared to Ms. Johnson to be "tripping" on crack cocaine; she denied, however, that she used cocaine on the evening of the incident. Ms. Johnson testified that Thomas became angry, went to the kitchen, came back to the bedroom with a bowl in his hand, and threw some hot liquid at her, scalding her face, neck, and arms. Ms. Johnson sustained second degree burns on her face and arms.

Thomas' account of the incident was quite different. According to Thomas, Ms. Johnson had asked him to bring her some crack cocaine. Thomas purchased some crack and brought it to Ms. Johnson's home, together with a bottle of gin and, somewhat incongruously, some carrot juice. Thomas testified that the quarrel began while the two principals were smoking crack and drinking liquor together in the bedroom. According to Thomas, Ms. Johnson complained that "the shit wasn't no good" and demanded that Thomas give her more cash. Thomas refused and Ms. Johnson, who is bigger than Thomas, became angry, pulled him onto the bed, and began to berate him. Thomas retreated to the kitchen and began washing dishes at

---

1. D.C.Code § 22–504. All references to the District of Columbia Code in this opinion are to the 1996 Supplement to the 1981 edition.

2. D.C.Code § 22–504.1.

3. D.C.Code §§ 22–506 and –103.

4. D.C.Code § 22–502.

the sink. When Ms. Johnson continued to ask for money, Thomas told her she should "go out in the street and get it the way she has been," *i.e.*, by "tricking." Ms. Johnson, apparently displeased by this suggestion, "reached at the stove, grabbed a pan, and swung at [him]." Thomas testified that he raised his arm to protect himself, and that the liquid in the pan "spilled back onto Clarice" and burned her. Thomas himself was burned by the lower part of the pan.

There were no other witnesses to the scalding incident. Ms. Johnson's eighteen-year-old daughter, Celeste, testified that two of Thomas' sisters subsequently telephoned her several times to urge that the charges against their brother be dropped. Ms. Johnson testified that Thomas told her that he was sorry for what he had done. He also wrote to her from jail, declaring his love and inquiring whether she would press charges. There was no claim that either Thomas or his sisters threatened Ms. Johnson to dissuade her from testifying.

Ms. Johnson was impeached with some arguably minor contradictions between her trial testimony and her grand jury testimony. After being given immunity, she admitted that she had threatened another woman for allegedly acting indecently around Thomas.[5]

## II.

### LEGAL ANALYSIS

A. *The replacement of Juror No. 1.*

Thomas contends that the trial judge violated his "Fifth Amendment right to have his trial completed by a particular tribunal," as well as his rights under Su-

per. Ct.Crim. R. 24(c), by replacing a juror with an alternate before deliberations began. Even if the judge erred in this regard—an arguable question which need not be decided to resolve this appeal—the error was harmless.

The challenged replacement in this case occurred before the jurors began deliberating, and before any juror had been advised whether he or she was an alternate. The judge observed that Juror No. 1 appeared "totally exasperated by the fact that [counsel] were both speaking and that she is here." She further stated that the juror was "speaking under her breath" while counsel were presenting their arguments and during the court's instructions. Sensing from Juror No. 1's apparently angry demeanor and odd behavior that she probably would not be an attentive or impartial juror, the judge replaced her with an alternate. Thomas' counsel vigorously objected to the juror's removal, but he proposed no alternative course of action (*e.g.*, a hearing on the juror's qualifications).

Rule 24(c) directs the court to "replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." "The trial court is accorded substantial deference on [the decision whether to replace a regular juror] as a result of its superior ability to observe the demeanor of the juror and its familiarity with the proceedings." *Darab v. United States*, 623 A.2d 127, 138 n. 26 (D.C. 1993). Rule 24(c) of the *Federal Rules of Criminal Procedure*, which is identical to the local rule, has been construed as authorizing the replacement of a juror with an alternate "when facts arise before the start of deliberations that cast doubt upon

---

5. At the trial, Ms. Johnson originally claimed that she could not recognize Thomas, her paramour for some eight years. It appears, however, that she did not bring her glasses to court, and she was able to recognize Thomas from close up.

a juror's ability to perform her duties." *United States v. Smith*, 918 F.2d 1501, 1512 (11th Cir.1990), *cert. denied*, 502 U.S. 849, 112 S.Ct. 151, 116 L.Ed.2d 117 (1991), 502 U.S. 890, 112 S.Ct. 253, 116 L.Ed.2d 207 (1991).[6] The trial judge evidently believed that the conduct of Juror No. 1 was sufficiently irregular to raise serious doubt as to this juror's ability to perform her duties. As appellate judges, my colleagues and I are limited to a paper record, and we are necessarily reluctant to second-guess the trial judge's on-the-scene personal assessment.

 Nevertheless, Thomas' contention that the judge abused her discretion in replacing Juror No. 1 is not implausible. Read literally, Rule 24(c) authorizes the removal of a juror only if the juror is "unable or disqualified" to perform her duties. The trial judge never made such a finding, at least explicitly. To be sure, muttering under one's breath, both during closing argument and while the judge was charging the jury, may suggest inattention on the juror's part, and a juror may properly be disqualified for being inattentive. *Shreeves v. United States*, 395 A.2d 774, 787 (D.C.1978). The judge did not, however, explicitly state that Juror No. 1 was inattentive, nor did she contradict Thomas'

attorney when he asserted that the opposite was true. Indeed, the record contains no reference on the part of the judge to Rule 24(c)'s demanding standard: "unable or disqualified."[7] "Judicial discretion must ... be founded on correct legal principles, and a trial court abuses its discretion when it rests its conclusions on incorrect legal standards." *In re J.D.C.*, 594 A.2d 70, 75 (D.C.1991). "A [trial] court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). If the judge in this case in fact applied the standard set forth in Rule 24(c) at all, she certainly did not do so explicitly. Accordingly, whether Thomas has demonstrated in this case that the trial judge abused her discretion in the *Koon* sense is not an easy call.

 But even assuming, *arguendo*, that Juror No. 1 was not shown or found to be "unable ... to perform her duties" within the meaning of Rule 24(c), and that the judge therefore erred by replacing her, Thomas must nevertheless establish prejudice. *See, e.g., United States v. Nelson*, 102 F.3d 1344, 1349 (4th Cir.1996), *cert. denied*, 520 U.S. 1203, 117 S.Ct. 1567, 137 L.Ed.2d 713 (1997).[8] Specifically, Thomas must show that as a result of the removal

6. Where, as here, the local rule and the federal rule contain the same language, the construction of the federal rule by a United States Court of Appeals is persuasive authority as to the proper interpretation of the local rule. *See, e.g., Peddlers Square, Inc. v. Scheuermann*, 766 A.2d 551, 556 n. 4 (D.C.2001).

7. In fairness to the trial judge, I note that counsel did not bring the language of Rule 24(c) to the court's attention. Moreover, the rule is arguably somewhat counter-intuitive; where, as here, there were two persons available to serve on the jury (Juror No. 1 and an alternate whom no party had challenged), and where one of the two appeared to act in a peculiar and perhaps irrational manner, it would not be unreasonable to suppose that

the judge was authorized to disqualify the individual who acted peculiarly, especially where, as in this case, the jurors had not been told who the alternates were. But be that as it may, Juror No. 1 could properly be removed only if the requirements of Rule 24(c) were satisfied.

8. I recognize that, in most cases, it will be difficult to prove specific prejudice stemming from a Rule 24(c) violation. *See United States v. Donato*, 321 U.S.App. D.C. 287, 291, 99 F.3d 426, 430 (1996). Nevertheless, the harmless error standard of *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) still applies. *Donato, supra*.

of Juror No. 1, "an impaneled juror failed to conscientiously apply the law and find the facts." *Tate v. United States*, 610 A.2d 237, 239 (D.C.1992) (citations and internal quotation marks omitted). In this case, "[b]ecause the defendant[ ] make[s] no assertion that [he] suffered bias or prejudice [from the presence of the alternate on the jury], and do[es] not claim that the alternate juror was not impartial, [his] conviction[ ] would not be subject to reversal even were we to conclude that dismissal of [Juror No. 1] was an abuse of the [trial] court's discretion." *United States v. Alexander*, 48 F.3d 1477, 1485 (9th Cir.1995) (citation and internal quotation marks omitted).

 Thomas has presented no evidence whatever of prejudice. Indeed, his attorney passed on five of defense's ten peremptory challenges to the jury proper, and he also declined the opportunity to strike the alternate who ultimately replaced Juror No. 1, thereby at least implicitly expressing satisfaction with that juror. *See Darab*, 623 A.2d at 139. There is no suggestion that any of the twelve jurors who convicted Thomas was biased against him. "A party to a lawsuit has no vested right to any particular juror; the right of challenge is the right to exclude incompetent jurors, not to include particular persons who may be competent." *Id.* at 139 (citation omitted). Thus, even assuming without deciding that the judge erred in substituting an alternate for Juror No. 1, the error was harmless.[9]

B. *The restriction of the cross-examination of the complaining witness.*

During her testimony, Ms. Johnson vehemently denied that she assaulted Thomas with the bowl of hot liquid; on the contrary, she testified that the defendant assaulted her. Ms. Johnson likewise denied that she was using crack cocaine at the time of the scalding incident. Thomas claims that the trial judge committed reversible error by precluding the defense from cross-examining Ms. Johnson regarding two alleged reasons for her to lie: apprehension that she would go to prison if she admitted assaulting Thomas or using unlawful drugs,[10] and fear of adverse con-

---

9. Thomas also contends on appeal (1) that the trial judge should have held a hearing to determine whether Juror No. 1 was "unable or disqualified," and (2) that the judge's disqualification of Juror No. 1 in effect gave the prosecution an additional peremptory challenge. Neither of these claims was presented to the trial court, and Thomas has not shown that the judge committed plain error by failing to hold a hearing *sua sponte* or by providing the government with an extra strike. Contrary to Thomas' position, "errors adversely affecting the exercise of peremptory challenges [are] not structural errors" (within the meaning of *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). *Johnson v. United States*, 804 A.2d 297, 304 (D.C.2002) (citing *Lyons v. United States*, 683 A.2d 1066, 1067 (D.C.1996) (en banc)).

10. Thomas' attorney asked Ms. Johnson several times whether she knew that she could get into trouble with the police if she admitted committing an assault or using crack cocaine. Ms. Johnson answered, somewhat unresponsively, that she had not done anything wrong. After some repetition, the judge sustained an objection to further questioning on this subject. As the government notes in its brief, "[g]iven Ms. Johnson's responses to defense counsel's questioning, there was really no prospect that additional questioning would have yielded an admission that the witness did, in fact, fear that her conduct on May 29 would land her in jail."

Thomas claims that the judge should have overruled the objection and that the jurors should have been permitted to assess Ms. Johnson's demeanor during the further questioning on the subject of her possible fear of incarceration. But the jury had ample opportunity to observe Ms. Johnson's demeanor, and the judge did not abuse her discretion by holding, in effect, that the subject had been sufficiently explored and that further ques-

sequences with respect to her retention of custody of three of her children and the return to her of two other children if she made such an admission.[11]

"While exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination, *Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Sixth Amendment does not prevent a judge from 'imposing any limits on defense counsel's inquiry into the prejudicial bias of a prosecution witness.'" *Ray v. United States,* 620 A.2d 860, 862 (D.C.1993) (internal quotation marks omitted) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). The trial court may restrict bias cross-examination "to avoid such problems as harassment, prejudice, confusion of the issues . . . or interrogation that is repetitive or only marginally relevant. . . . [or] where the prejudicial effect of the proffered evidence outweighs its probative value." *Guzman v. United States,* 769 A.2d 785, 790 (D.C.2001) (citations and internal quotation marks omitted). "The Confrontation Clause is violated . . . only when the trial court precludes a meaningful degree of cross-examination to establish bias." *Grayton v. United States,* 745 A.2d 274, 279 (D.C.2000) (citations and internal quotation marks omitted). "After sufficient cross-examination

has been allowed to satisfy constitutional requirements, the trial court retains broad discretion to determine the scope and extent of cross-examination." *Velasquez v. United States,* 801 A.2d 72, 79 (D.C.2002) (citation omitted). "The extent of cross-examination with respect to a witness' motive to lie is confided to the trial judge's sound discretion." *Brown v. United States,* 683 A.2d 118, 126 (D.C.1996). Although some cross-examination with respect to a separate theory of bias must generally be permitted,[12] the trial court may, in its discretion, preclude such cross-examination altogether if its probative value is slight, if it would be only marginally useful to show bias, and if the proposed line of questioning is substantially prejudicial or tends to divert the jury's attention from the issue at hand. *Coles v. United States,* 808 A.2d 485, 490–91 (D.C.2002) (citations omitted).

In the present case, Ms. Johnson's underlying motive to lie was, in my opinion, surely obvious to any reasonably intelligent juror. If Ms. Johnson had acknowledged assaulting Thomas or using crack cocaine, or both, she would have admitted criminal conduct for which she could have been incarcerated. Indeed, the defense so argued to the jury without objection. Moreover, from prison, it would plainly have been difficult, if not impossible, for Ms. Johnson to maintain custody of the

tioning was not necessary to enable the jurors to evaluate Ms. Johnson's demeanor.

**11.** The defense proffered that two other children had been removed from Ms. Johnson's home, possibly on account of her alleged drug use.

**12.** As the Supreme Court explained in *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431, the trial court generally must allow some cross-examination "designed to show a prototypical form of bias[,]" defined as one from which "[a] reasonable jury might . . . receive[] a

*significantly different* impression of [the witness'] credibility" (emphasis added) from that which other questioning has permitted. *See Olden v. Kentucky,* 488 U.S. 227, 232, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). Whether cross-examination of Ms. Johnson about her fear of not regaining custody of two of her children, or of losing custody of her other three children, could reasonably have given the jury that "significantly different impression"—one not resting on negative inferences about her character as a parent—is the question I would answer negatively in the discussion that follows.

children who were living with her, or to regain custody of other children who may have been removed from her home. Indeed, incarceration would drastically alter all aspects of her life, including her relationship with her children. With the dominant motive so obvious, I perceive no abuse of discretion in the trial judge's preclusion of further cross-examination regarding any incremental motivation that could have been provided by inquiring into the situation of Ms. Johnson's children, especially since, as the judge reasonably concluded, the proposed cross-examination was likely to "further dirty [Ms. Johnson]"—as someone whose children the state had been forced to remove from her custody—and "make her less sympathetic." *See, e.g., Grayton*, 745 A.2d at 279; *Burgess v. United States*, 608 A.2d 733, 736 (D.C.1992).[13] In this regard, I disagree with my colleagues' contrary conclusion, and the discussion in this paragraph is not a part of the opinion of the court.

### C. *The cross-examination of Thomas regarding alleged other "bad acts."*

During Thomas' cross-examination, the prosecutor inquired without objection whether crack cocaine affected Thomas' demeanor. Thomas initially replied that "it makes me feel good" and that it "doesn't affect my behavior where I'm going to become violent." The prosecutor pressed on, and she asked Thomas, again without objection, whether there had ever been an occasion when crack did cause him to behave in a violent manner. Thomas admitted that there was one such occasion, but he again denied that crack cocaine made him violent. The prosecutor asked about the one occasion to which Thomas had referred, and, there still being no objection, Thomas said that he got "bust [sic] in the head" because he was in the wrong place at the wrong time.

The prosecutor then inquired whether the "bust in the head" incident occurred in 1998, when, according to the prosecutor, Thomas punched his sister Dorothea and his nephew. Thomas replied that the "bust in the head" incident was a different one from the encounter with his sister and nephew. The prosecutor then pressed Thomas about the 1998 incident, at which point the defense objected for the first time, claiming that the question was not relevant. The judge overruled the objection. Thomas then described the 1998 incident as one in which his sister was intoxicated: "[T]he bull just came out of Dorothea." Thomas admitted grabbing his sister, but he did not acknowledge that he had punched either his sister or his nephew.

On appeal, Thomas argues that the prosecutor "baited" him into putting his character into evidence, and that she then elicited "other bad acts" evidence to destroy Thomas' character. The "baiting" charge is not without substance, but there was no objection to the "baiting" questions until after the claim of good character had been made.[14] Moreover, the testimony about the 1998 encounter—as distinguished from

---

13. Even if the judge's restriction on cross-examination constituted an abuse of discretion—and I am satisfied that it did not—I am of the opinion, in light of the ample evidence of motive to lie, that any hypothetical error was harmless. There is no reasonable possibility that Ms. Johnson would tell the truth even if it meant going to prison (and probably losing custody of her children), but would lie in order to avoid impairing her chances of retaining or regaining custody. At the very least, the trial judge could reasonably so conclude.

14. On direct examination, Thomas had testified in substance that Ms. Johnson tended to be aggressive and that he attempted to keep things peaceful and avoid trouble.

the intimations in the prosecutor's questions—established little more than the "grabbing" of a drunk and quarrelsome sister. No limiting instruction was requested or given. Under the circumstances, even assuming, *arguendo,* that the belated defense objection should have been sustained, my colleagues and I are satisfied that any incremental prejudice from Thomas' description of the event was minimal, and that any error was harmless. *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239.[15]

In sum, the judgment should be affirmed.

FARRELL, Associate J., concurring.

I agree with Judge Schwelb's resolution of the juror replacement issue and appellant's other contentions, but I agree with Judge Ruiz's conclusion—though not all of her reasoning—that the trial judge imposed an unconstitutional limitation on the cross-examination of Ms. Johnson. Unlike the dissent, however, I am convinced that that error was harmless beyond a reasonable doubt, and I therefore join Judge Schwelb in voting to affirm.

■■■ The trial judge erred in disallowing all questioning of Ms. Johnson about whether she feared that the outcome of the trial—and a possible focus by the authorities on her own conduct—would affect her ability to regain (or retain) custody of her children. However much or little the witness feared being charged *criminally* for her actions on the night in question, her possible concern that an ongoing dispute over the custody of her children would be influenced by whether authorities believed her description of the violent events or

appellant's was a separate and "appropriate [subject of] cross-examination designed to show a prototypical form of bias on the part of the witness." *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The government rightly points to the danger that injecting a complainant's fitness as a parent into a case such as this may deter the bringing of well-founded charges of domestic assault. But that risk must be addressed by limitations on the scope and amount of questioning permitted, *see id.* at 679, 106 S.Ct. 1431, and by a limiting instruction underscoring that only the witness's state of mind, not her character or fitness as a parent, is at issue. The jury here, for example, would not have needed to learn that the Child Protective Services agency had removed Ms. Johnson's children (or two of them) from her home, and it likewise would not have had to learn that a determination of "neglect" had been made with respect to the children. It would have sufficed for defense counsel to be able to bring out that she was engaged in a controversy over the custody of her children and to ask if she was afraid this would be affected by the outcome of the trial. But preclusion of *any* bias cross-examination on the subject was error under *Van Arsdall.*

■■■ Nevertheless, in my view we "may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Id.* at 681, 106 S.Ct. 1431. If the jury was going to accept appellant's defense that Ms. Johnson was the aggressor and her injuries an accident, it had an ample record on which to do so.

---

**15.** Thomas also argues that the testimony about the telephone calls made by his sisters should not have been received in evidence. The prosecution did not claim, however, that these calls were threatening. Even assuming, *arguendo,* that this evidence was erroneously admitted, its admission was harmless. Thomas' attorney could have requested a limiting instruction regarding the purpose for which evidence of the calls could be considered by the jury, but counsel made no such request.

On that record, in fact, it acquitted appellant of everything but the least serious offense charged, simple assault. Both parties testified and admitted to a sometimes turbulent relationship in which Ms. Johnson—larger in size than appellant—had not shied from using force against him. She also admitted to having threatened and assaulted another woman for actions in appellant's presence. Yet the fact remained that on the night in question Ms. Johnson, not appellant, had been burned in the face and neck by hot grease or oil and that, while still in obvious pain and distress, she had reported his responsibility for the burning to the police and a hospital physician.

In short, Ms. Johnson's character for potential violence was before the jury, and, as Judge Schwelb explains, her incentives to shift the blame to appellant were explored to a considerable extent. "The jury had ample reason to disbelieve [her account] if they were so inclined." *McCoy v. United States*, 760 A.2d 164, 178 (D.C. 2000). On the other hand, her fresh complaint to the police and hospital of the cause of her injuries corroborated her testimony in court. *See Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431. Viewing the whole record, and even "assuming that the damaging potential of the [erroneously disallowed] cross-examination were fully realized," *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431, I nonetheless am convinced there is no realistic possibility that a jury having learned all it did about both disputants would have acquitted appellant altogether.

**1.** I join Judge Schwelb's opinion with respect to the other issues raised on appeal.

**2.** Judge Farrell agrees that the limitation on cross-examination was constitutional error, but affirms the conviction because he considers the error to have been harmless.

RUIZ, Associate Judge, dissenting:

I believe that the trial court erred in excluding the defense's proffered cross-examination of the government's key witness to establish her bias and motive for testifying as she did.[1] Therefore, I would reverse and remand for a new trial.[2]

1. *Preclusion of cross-examination on neglect proceedings*

The trial court did not permit counsel to question the complaining witness as to whether she was afraid that she might "get in trouble with the police"[3] on the ground that the witness denied having done anything wrong. Later in the cross-examination, defense counsel proffered that he had information that two of the complaining witness's children had been removed from her custody and that she had been warned that two other children still living with her also might be removed from her care and placed in a foster home. Counsel added that even though he had not seen the file jacket in that case, which was confidential, he believed it was an "abuse and neglect type situation" that had resulted in the children being removed from the home. He argued that in light of the adjudication of neglect of two of her children and the warning about a possible additional neglect proceeding for her other children, the complaining witness had reason to lie or shade the truth about what had occurred in her encounter with appellant because if she admitted to having used drugs or participated in violent behavior, she could jeopardize her ability to regain or maintain custody of her children. The

**3.** Defense counsel asked the witness:

... My question I want you to answer is you know you could get in trouble if the police found out you did something wrong on May 29?

trial judge did not permit the cross-examination, ruling that the proffer was "too speculative" and that, "even if the facts happened here [in the criminal case] that she was the aggressor, it would not be a basis for a neglect or an abuse .... There has to be a factual basis before I would allow you to pursue that. You have not made one ... I think you have to have even more to entitle you to that ...." The trial judge also considered that the line of questioning was prejudicial, because the inquiry would "embarrass" the witness and would "further dirty her and make her less sympathetic."

The Confrontation Clause of the Sixth Amendment to the U.S. Constitution guarantees a criminal defendant the opportunity for effective cross-examination of adverse witnesses. *See Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Alford v. United States,* 282 U.S. 687, 691–92, 51 S.Ct. 218, 75 L.Ed. 624 (1931). A trial court violates a defendant's right to confrontation when the court prohibits the defendant from "engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness" thereby exposing facts "from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431 (quoting *Davis,* 415 U.S. at 318, 94 S.Ct. 1105). We have held that "bias or testimonial motivation is always a proper subject of cross-examination," *Clayborne v. United States,* 751 A.2d 956, 962 (D.C. 2000), and that the bias of a witness is "never" a collateral issue, *In re C.B.N.,* 499 A.2d 1215, 1218 (D.C.1985).

In considering the admission of proposed cross-examination for bias, the trial court performs its usual role of weighing the proffered evidence's probative value against its prejudicial effect on the fair and efficient conduct of the trial, and need not permit cross-examination on topics of marginal relevance simply upon the possibility that bias or prejudice might be disclosed. *See Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). But a defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to testify. *See Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431. "While the scope of cross-examination is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." *United States v. Elliott,* 571 F.2d 880, 908 (5th Cir.1978) (citation omitted). Thus, error is shown when a reasonable jury might have had a significantly different impression of the witness's credibility if the defendant's counsel had been permitted to pursue an appropriate line of questioning. *See Clayborne,* 751 A.2d at 962. Once a good faith proffer of bias is presented to the trial court, the jury should learn of a witness's bias, unless the probative value of the evidence is "substantially outweighed" by the risk of undue prejudice. *Id.* at 962–63.

In this case, the trial court applied an incorrect legal standard in excluding cross-examination about the witness's fears stemming from the ongoing neglect case involving her children. By focusing on whether the complaining witness's aggressive conduct toward appellant would be "a basis" to establish neglect toward her children, the trial court missed that what is relevant in evaluating bias is not what the law or a judge considers sufficient to prove neglect, but the witness's subjective belief. "[I]t is this belief that can produce bias." *Scull v. United States,*

564 A.2d 1161, 1165 (D.C.1989). Because the trial court applied an incorrect legal standard in determining relevance, it did not grasp the probative value of the proffer. Having misunderstood the relevance of the proposed line of questioning, the trial court precluded the inquiry based solely on its perceived prejudice to the witness. Therefore, its balancing of probative value and prejudice was inherently flawed.

Because cross-examination was precluded, the witness's understanding of what admissions would expose her to criminal liability was not explored. Lay persons frequently have mistaken notions about the law, and this could be particularly so in cases of domestic violence, where lay persons are uncertain about the reach of the criminal law into what many consider to be their private affairs. Nor do we know what the witness thought her criminal exposure might be if she were to admit to being something more than the passive victim of an assault. The outcome in this case, for example, shows that appellant was acquitted of the felony charges and convicted only of simple assault, for which he was sentenced to 180 days incarceration. Of particular importance in this case would be the witness's understanding of the risk of conviction in a criminal proceeding where the government has the burden of proving guilt beyond a reasonable doubt against the prospect of continued intervention by child welfare agencies—particularly once neglect has already been found—where the standard is focused on the "best interest of the child." D.C.Code § 16–2320(a) (2001). There is

much less tolerance for parental misbehavior in the child neglect system than in a criminal proceeding.

The witness's motivation to lie to avoid inculpating herself in this case was, as Judge Schwelb says, "surely obvious to any reasonably intelligent juror." See *ante* at 32. We cannot presume that if the witness would lie, however, she would do so only and to the same extent to avoid implicating herself in the criminal offense, and not because of concerns related to the child neglect proceeding.[4] Whereas that might be a valid assessment in certain cases, that is not necessarily how the witness in this case would think, and it was the jury's prerogative—not ours—to hear and evaluate her testimony on these matters. Though trial judges must perforce attempt to evaluate the relevance of evidence in making admissibility determinations, where the issue is cross-examination for bias, judges should be particularly sensitive not to usurp the role of the jury. As opposed to evidentiary calls where the judge performs a gatekeeping function in order to exclude irrelevant evidence or evidence presumed to be prejudicial, where the Confrontation Clause is implicated the gate is purposely left ajar. The importance of the interest protected by the Confrontation Clause tips the scales in favor of permitting cross-examination such that "[t]he broad discretion afforded the trial court as to the extent of cross-examination 'cannot ... justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.'" *Bennett v. United States*, 797 A.2d 1251, 1257 (D.C.

---

**4.** According to Judge Schwelb, "[t]here is no reasonable possibility that Ms. Johnson would tell the truth even if it meant going to prison (and probably losing custody of her children), but would lie in order to avoid impairing her chances of retaining or regaining custody." See *ante* at 32. Under the relevant statute,

however, incarceration does not automatically lead to loss of custody. *See* D.C.Code § 16–2301(9)(c) (a neglected child is one "whose parent ... is unable to discharge ... her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity").

2002) (quoting *McCloud v. United States,* 781 A.2d 744, 752 (D.C.2001)).

Bias is present in every case where the witness's own potentially criminal conduct is implicated in the charged offense. Precisely because it is so commonplace, that kind of bias is likely to be expected by the jury. It is more likely to be discounted in the jury's assessment of the witness's credibility, however, where the witness is testifying on behalf of the government—as in this case—and in the eyes of the jury benefits from an aura of credibility created by the government's decision to charge the other person involved in the fray. Thus, there is added importance to presenting concrete information so that the jury can evaluate the precise pressures at work on the witness. The bias that defense counsel was attempting to reveal in this case through cross-examination about the neglect proceeding was specific and more unusual. It could have had real impact because it involved something not obvious to the jury, that was not part and parcel of what the jurors would normally have expected in a he said-she said situation such as this. In this case there was reason to believe that the witness's understanding about the workings of the neglect system and her fear of how her testimony in this criminal case might affect decisions concerning her children in the neglect case, would give her a strong motive to lie or, at least, minimize her culpability in order to "look good" in the eyes of those judging her in the context of the neglect case. This motivation is akin to the well-recognized bias of a witness in favor of the prosecution in the hope of obtaining better treatment for her own crimes in a different case either while on probation, *see Davis,* 415 U.S. at 318, 94 S.Ct. 1105 (evidence of prior juvenile offense admissible to afford a basis for an inference of undue pressure because of the witness's vulnerable status as a probationer), or while on parole, *see*

*State v. Luzzi,* 147 Conn. 40, 156 A.2d 505, 507 (1959) (right to establish motive of witness to "color her testimony" so as to "absolve herself from as much blame as possible and thereby gain[ ] for herself more lenient treatment"). A jury could well understand that a mother whose children have been adjudged neglected while in her care feels she is "on probation" during the time that the child welfare authorities are monitoring her behavior in considering whether to return children to her home or remove those who are still there.

The witness's fear—whether reasonable or not—that her actions in the melée with appellant might influence decisions concerning her children would have given the jury important insight into a specific force motivating her testimony—and the strength of that motivation. The fear of losing custody of children and the stigma associated with it cannot be assumed to be of less importance than the fear of conviction and even incarceration, as each deals with different social values. *See Commonwealth v. Piedra,* 478 N.E.2d 1284, 20 Mass.App.Ct. 155, 157 (Ma.1985) (reversible error to bar "specific inquiry on the issue of motive" even though inquiry allowed into witness's bias in general). The trial judge was concerned that evidence of the neglect adjudication could "embarrass" and "further dirty" the witness before the jury. That concern is but a recognition of the importance that our society places on child neglect, and the witness—as well as the jury—is influenced by those values. The jury could believe that the witness would have been powerfully influenced by maternal concern for her children as well as by the stigma that the judge recognized attaches to a determination of neglect. For some, this could be a fate worse than incarceration. *Cf. INS v. St. Cyr,* 533 U.S. 289, 322, 121 S.Ct. 2271, 150 L.Ed.2d 347

(2001) (citing *Magana–Pizano v. INS*, 200 F.3d 603, 612 (9th Cir.1999) ("That an alien charged with a crime ... would factor the immigration consequences of conviction in deciding whether to plead or proceed to trial is well documented."); 3 BENDER'S CRIMINAL DEFENSE TECHNIQUES §§ 60A.01, 60A.2[2] (1999) ("Preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.")).

Any concern the trial judge reasonably had about jury confusion or taint from evidence that Johnson had been adjudged a neglectful mother could have been addressed by a limiting instruction on the proper use of the evidence. All that the jury needed to know was that there was a pending neglect proceeding and, without going into unnecessary detail, that Johnson feared the impact that her testimony in the criminal case could have on that proceeding. Complete exclusion "bears a very heavy burden of justification when lesser restrictions are available." *Brown v. United States*, 740 A.2d 533, 537 (D.C. 1999). Thus, I conclude that it was error to exclude the cross-examination into Johnson's concern about the child neglect proceedings.

### 2. Harm

Restrictions on cross-examination require reversal depending "upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as other circumstances that prevailed at trial." *Flores v. United States*, 698 A.2d 474, 479 (D.C.1997) (citation omitted). The Confrontation Clause is violated and we apply the constitutional harmless error test of *Chapman v. California*, 386 U.S. 18, 22–23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), whenever "the trial court precludes 'a meaningful degree of cross-examination' to establish bias." *Grayton v. United States*, 745 A.2d 274, 279 (D.C.2000) (quoting *Flores*, 698 A.2d at 479); *see also Scull*, 564 A.2d at 1166. Here, the trial court's ruling prohibited defense counsel from exposing Johnson's bias and motive to lie arising from the neglect case, an entirely separate line of relevant questioning, depriving appellant of a "meaningful degree of cross-examination." *See Grayton*, 745 A.2d at 279. Applying the *Chapman* standard to violations of the Confrontation Clause, we must be able to say, beyond a reasonable doubt, that even if the jury had been convinced that Johnson was motivated to lie because of concern about the neglect proceeding, it would have convicted appellant of assault. *See Scull*, 564 A.2d at 1166. In this case that is tantamount to saying that appellant would have been convicted "without [Johnson's testimony]." *Id.*

On this record, I must have a reasonable doubt because Johnson's testimony was the key to the government's case. She and appellant testified to completely different versions of events, and there was no other eyewitness testimony. Although Johnson sustained more serious injuries, appellant also was burned on his arm—injuries that could be explained by either one's version of the incident. Moreover, there was circumstantial evidence to support appellant's story: Johnson had behaved aggressively toward appellant on previous occasions; out of jealousy she had threatened other women in the past; her version of events was inconsistent and implausible; and she previously had denied that appellant assaulted her in this instance. Renae Dreher, an impartial witness, testified that Johnson had a reputation for violence and dishonesty. The admission of the proffered bias evidence was thus critical to the defense case, which hinged on showing that Johnson, who was shown to have been untruthful in the past,

in this case had a strong motivation to lie again in order to protect her relationship with her children. Though Johnson's reports to the police and doctor made soon after the incident could have been viewed as more reliable than her in-court testimony, the verdict makes clear that the jurors did not credit those statements any more than her trial testimony, or they would have returned a guilty verdict on at least one of the felony charges. There is no substantial difference between Johnson's testimony in court and what the police and doctor reported she said to them right after the incident.[5] Because the government's case was grounded on Johnson's credibility and the jury's verdict clearly discounted most of the government's case, I cannot conclude beyond a reasonable doubt that the erroneous preclusion of cross-examination that would have given the jury a complete picture of the extent of Johnson's bias would not have made a difference. Had the jury heard about the pending neglect case and Johnson's feelings about it, the jury could have inferred that Johnson understandably felt she was under close scrutiny and, as a result, would deny *any* involvement with drugs and aggressive action out of fear that negative conduct on her part—even if insufficient in her eyes to constitute criminal behavior—would weigh against her in the neglect proceedings. A jury that believed Johnson was on drugs and aggressive on that occasion could well have believed appellant that it was not he who assaulted Johnson but vice-versa.

I would reverse and remand for a new trial.

---

5. The essence of Johnson's in-court testimony and her reports to the police and doctor at the time was the same: that appellant had be-

come angry and thrown a hot liquid at her, scalding her face, neck and arms.